Mr. Weiss and Mr. Faircloth, good afternoon. Your panel today is me, Judge Diggins, Judge Higginson, and Judge Whittaker, and we'll proceed with the first argument about Mr. Faircloth. Mr. Faircloth. Thank you, Your Honor. Good afternoon. I appreciate the court doing this. I know these are trying times, and I understand they are probably difficult for the court to try to marshal the arguments in such peculiar circumstances, but here we are, and we'll do the best we can. Your Honor, I'm Jimmy Faircloth. I represent the appellants in the case, who I will collectively refer to as the bar owners. I respectfully reserve five minutes for rebuttal. There are three topics that I'll try to cover today, Your Honor, depending, of course, on your questions. The first is the mootness issue, which I'll address first as a matter of jurisdiction. The second is the standard under N. Ray Abbott and Jacobson, and the third is the merits of the equal protection claim, as that is the only claim that is before the court from the district courts. We asserted a number of claims, but for strategic matters, mostly dealing with efficiency and expediency, those were the claims we chose to move to this court. The appellants' equal protection claim is not moot, Your Honor. In fact, it is far from moot. The standard for mootness, as the court well knows, is stringent, and the burden is formidable for a party asserting mootness, as this court and the Supreme Court have stated a number of times. I cited several of those cases in our brief in opposition to the motion to dismiss. There were a couple other cases that have come out more recently. Judge Willett, Derelam v. Trump, you dealt with the issue of mootness, and I think the court captured most of the standard rules in that opinion. And there's a more recent one, Poole v. City of Houston. It does not involve any of the members of this panel, but it was also a voters' rights case, and it dealt with the issue of mootness, and I thought it likewise captures most of the standard rules. It's important here, Your Honor, to recognize that the challenge by the appellants is to the Bar Closure Order, and we've referred globally to the Bar Closure Order. It's 89 JBE 2020. It's really a series of orders. The order number 89 first established the closure, as we've called it, and then it was extended and modified slightly over the course of the last few months. The latest version, the Phase 3 order, is merely a continuation. It at most alters the previous order. It certainly doesn't terminate the order, and it doesn't terminate this controversy. Most importantly, it preserves the on-site prohibition of the sale of alcohol or food, which applies to bars. So the prohibition itself is preserved in this Phase 3 order. It also preserves the differential classification challenge, and that is the AG versus AR permit distinction that was covered in our briefs. It's important on the equal protection claim because it's recognized correctly by Judge Feldman. The AG versus AR distinction is the distinction that drives the bar owner's challenge. So this driver of the bar owner's equal protection challenge is, in fact, preserved in the Phase 3 order. So again, it's far from moot. I would also point out, and I don't think this can be gainsaid, the fundamental problem with the order, with the bar closure order, is the lack of a definition of bar, what that means. That is not just an operative term. I would submit it is the most operative term in the order. Judge Feldman seized on that aggressively, and he chastised the governor for not defining that. He thought it was a gratuitous, created a gratuitous hardship in this instance, but he interpreted the order as defaulting to the state definition of bars, which is essentially dictated by the alcohol permitting scheme. I point that out in the context of the mootness argument because he did it again with the Phase 3 order. So rather than taking the opportunity to, in fact, deal with the controversy, which would be either lifting the order or, at a minimum, removing what I think is the grovelment of the problem, which is the lack of definition of bars, they simply did it again. So this current order suffers from the same equal protection problem. Really, it's the same vagueness problem, which creates the equal protection differential enforcement issue that makes the basis of our claims. Just so I understand, Phase 3 continues to draw a distinction between what I call, what I guess the district court's called restaurant bars and standalone bars. Tell me if I'm wrong. In as much as the AR businesses can operate at 75 percent and not connected to any positivity rate, but the AG bars, the standalone bars, are more restricted. So there's still deferential treatment even under Phase 3? Is that a basic? Okay. So that's why we've still got a live issue in terms of your equal protection claim. Yes, sir. That is exactly correct. It's what it did. It simply created conditions under which bars could reopen. It didn't categorically reopen bars. It didn't remove the differential distinction. It frankly didn't remove the differential treatment in terms of capacity. The AG bars were closed before and the AR bars could operate at 50 percent, whereas now if they meet the conditions, the AG bars could operate at 25 percent and the AR bars at 75. So there remains a 50 percent capacity spread as between those. Okay. So your second issue is Abbott and Jacobson framework, right? Yes, sir. The second issue is Abbott and Jacobson. It's the deeper issue, I will admit, and it's certainly an evolving issue. Judge Dennis, I know this is one near and dear to you as you dissented in both of the Abbott opinions. The Abbott issue turns on essentially what is the appropriate level of scrutiny. And Abbott applied into this case creates a conundrum of constitutional doctrine problems. And I think none of which I think are consistent with constitutional law as the courts understand it, as the courts have traditionally applied it. The fundamental question is what tier applies for scrutiny purposes? We have a tier one rationality review here. Surely Abbott does not create sub rationality. Surely it does not create what I would what I referred to in brief is is rationality like that. That would be completely ungovernable. And it seems to me inconsistent with any objective criteria the court could use to try to evaluate governmental conduct. There is no question here that these two opinions actually applied the Abbott Jacobson test to provide another level or another layer of deference to the rationality test that both courts applied. First, Judge Feldman was explicit. He stated that if this claim was a typical rational basis review, it would be one thing, but it is the Jacobson framework, not traditional tiers of scrutiny analysis that controls. He was very explicit in pointing out that he felt constrained by Abbott and Jacobson to apply even greater deference than the traditional rationality test. Judge Summerhays arrived at the same result, but he went a bit in a different direction. And I think the the problem created by Abbott shows itself best in his opinion because he created a completely new constitutional analysis. He instead of conducting, as Judge Feldman did, the rights analysis first, followed by the scrutiny analysis, which is where Abbott would fit if it applies. Judge Summerhays actually evaluated the rights analysis through the lens of Abbott and Jacobson. So it fundamentally distorts the constitutional tier one analysis because what happens is it's double deference. It's deference on the front end when reviewing the rights, and it's another level of deference on the back end when applying scrutiny. I think the best example of that is in Judge Summerhays' opinion, he refers to the order creates these AG versus AR classifications, but says, well, they're imperfect and the law allows imperfect classifications occasionally. But he specifically says it's not the role under Jacobson and Abbott, it's not the role of the court to second guess classifications and distinctions. Well, respectfully, Jacobson had nothing to do with the equal protection claim. Jacobson was pre-Caroline products. It was pre the tier constitutional doctrine that we use modern constitutional law. And so I would submit that and Abbott didn't deal with equal protection. So he transposed the Jacobson standard into the classification piece. And that's shown in that footnote of the very same section. He distinguished a case called Micsa by Kesko versus City of Galveston. It was a case that I cited in brief and argued because it is a 2006 opinion by this court, which I think gives a very clear statement of a tier of the standards for a tier one equal protection review. I think Judge Clement wrote it. Judge Higginbotham concurred. It's a real clear, crisp statement of the standards. Mr. Faircloth, just because your time is running out a little bit, getting lower. Obviously, we're still bound by Jacobson and Abbott, and you urge both lower courts to apply Abbott. So what is your argument now here to us? Is it that the proper interpretation of Abbott is that the level of review should be a rational basis test? No sub rational basis, no heightened deference, but still rational basis. Is that how you would approach this classification? Yes, Your Honor. OK, well, then that gets you to the third issue. But but and I happen to cite approvingly the Sixth Circuit case, fitness facilities. And it struck me that that's what that court did. It cites Jacobson. Of course, it's not citing Abbott. But then as to an equal protection claim asks, well, let's look at the classification that's been assessed and see if there's any rational speculation that justifies differential treatment from a standalone bar to a restaurant bar. And and then we get, you know, what I didn't really see in your briefs, because I agree with a lot of the analysis you've just described. Once we're at that point, why isn't there extensive logical and evidence based reasons that have been given that the standalone bar is closer and louder and people are more intoxicated in a restaurant bar usually has seated people and just doesn't create the same risk of virus spread? Well, that started as the governor's position on Friday, which on the Friday we tried the case before Judge Feldman. That was the governor's position. Dr. B, you the medical expert called. What's wrong with that position? Why doesn't that end the equal protection claim that there is rash much more than rational speculation to justify the permitting classification of these two? Because rational speculation should not be used to absolve a governmental actor from a improper decision that he claims he didn't make. I mean, the point of this is rational. The theoretic theoretical rational deference that that has been used is is done because the courts do not want to force the governmental actor. They don't impose a burden for them to actually prove their actual motive for conduct. And there's a body of academic support to eliminate that requirement. But but not getting into that here, the governor on Monday in front of Judge Feldman, excuse me, Summerhays took the stand and said, I made no distinction. The order makes no distinction. All bars are closed. He categorically denied a difference in the in the order or in the enforcement of the order categorically denied it. So to clarify, let me let me interrupt you for a second. I was confused a little bit by your response about three, four minutes ago to Judge Higginson about, you know, tiers of scrutiny and the proper standard we ought to apply. I thought you were arguing in your briefing that Abbott slashed Jacobson and rational basis review were distinct. They were different. Are you are you are you saying they're equivalent? Is it just sort of potato, potato or are they different? And which one applies? I don't think it lowers the rationality test. And that's the reason when I was asked by the district courts whether we object to Abbott and Jacobson. I did not, because frankly, I don't think that Abbott and Jacobson are lower rationality. They speak in terms of reasonableness, as Judge Dennis mentioned in the set. So and I think that rationality is different from reasonableness. So you don't think Abbott Jacobson is more deferential or lowers the bar even lower than rational basis? No, I do not. I think those cases read in proper context for what they are speak in terms of reasonableness. They do not speak in terms of rationality. They mention arbitrary conduct, but arbitrary conduct would become the outer limits of all constitutional basis. There's a couple of opinions from this court written by Judge Higginbotham's over the years has described it. But I do not believe that Abbott goes south of rationality. I do think you're not urging us to you're not urging us to apply anything more deferential than rational basis. That's correct. So then just but where in your briefs do you describe why these two district judges didn't have were incorrect, seeing that there was a rational basis to classify these two types of businesses differently? Where in the briefs do you point out that it's irrational how they've done it? I think I'll point to their actual language. They apply. They themselves view the case through the lens of Abbott and make the claim that they must give greater deference. Additional deference is just the other side of the coin. But it doesn't establish Supreme Court equal protection laws say that we don't look at even pretext. What we're looking at is the evidence that Judge Summers and Judge Feldman assessed and had before them the White House concerns, the tracing of the outbreaks, and especially the expert public health testimony about loudness and closeness and drinking only. None of which differentiates between the bar classifications. I agree. The White House spoke to that. And I think that's where this case got off the rails is because I think the courts focused, at least Judge Summers did, almost almost exclusively on the difference between restaurants and bars. This isn't a difference between restaurants and bars. This equal protection challenge is the difference between bars and bars. One type of bars that are AG and the other type of bars that happen to be in a restaurant, whether they're part of the restaurant facility or in a separate room. And the White House never spoke to that. Judge Dennis, if I can ask one more question. Yes, but the distinction is built on the fire marshal and the ATC classification. And so isn't it true that an AR business is one that's revenue is more than 50 percent from food? Well, OK, that seems rational to conclude from that they're more seated, they're more separated. They are people packed together socially. Instead, they're mostly eating, and therefore there will be less of a risk of spread. Why isn't that eminently logical and fact based? Well, that there is no right. There were no there was no evidence to prove rationality. And that is, again, the case that was tried before Judge Feldman, before the governor categorically rejected that distinction. Thank you. That's the difference here. You're right. Thank you. Thank you, Mr. Faircloth. May it please the court. Jack Weiss representing Governor Edwards and the fire marshal, the appellees in this case. With the permission of the court, I'm not going to follow Mr. Faircloth down the various byways and alleys that he's chosen to go down. But I'd like to go directly to what I think is the heart of the matter. And then I'm going to return, if I may, to the issue of mootness, not to downplay the issue of mootness, because I believe this case is as dead as a doornail. But I would I want to be sure that I place before the court the classification that's here, the standard which Judge Higginson has adverted to, to which Mr. Faircloth stipulated before Judge Summerhays, which is to say, if this classification is measured by the rational basis test, it's the burden of the plaintiffs, which they haven't met, to negate every conceivable basis for the classification. And that rationale, if you will, may be based upon what many courts have called rational speculation and not simply something resembling a substantial evidence on the record as a whole test that we might apply, say, in the context of administrative law. So, first of all, the classification. The governor relied upon the existing Louisiana law differentiation between A.R. Ah, restaurants, if you will, which must derive more than 50% of their total income from the sale of food and nonalcoholic beverages and the A.G. classification, which is freestanding bars. Now, as you know, in in the so called open safely guidance promulgated by the fire marshal, restaurant bars under this order of the governor's that's at issue here, 89 J.B.E. 2020 restaurant bars were required in effect to stop operating as bars and simply to operate as adjuncts of a restaurant. And we've argued that there really was no discrimination at all, that in effect, all bars were shut down from operating as bars. But I'll take it a step further. Suppose the classification is that freestanding bars were denied the right to make on premises sales of food and alcohol while the bar areas of restaurants, if you will, were allowed to operate in a restaurant like fashion that was denied to freestanding bars. The question then becomes, is that a rational classification? It isn't complicated. It's very straightforward. And, you know, what is the rational basis test? Again, I don't want to dwell on it. I'm imagine. Let me ask you what I asked. Mr Faircloth, do you think Abbott Jacobson is imposes a different standard than rational basis? Is it more deferential or the same? First of all, I don't think the court has to reach that question because I think the easily simply applying a rational basis test. However, I will say that I think the proper or a proper reconciliation of Jacobson and Abbott with the rational basis test is to look at Jacobson and Abbott as what I would describe as a kind of giant yellow caution light, a signal to every court that applies if you will, to stop, look and listen and apply the rational basis test with the utmost of care, a kind of this speaks ultimate standard, if you want to call it that. Or another way of looking at it is to say that rational basis review is at its apex in the context of a public health pandemic. But it is still rational basis review because, as I think we've all agreed, it's almost unimaginable that a court could sustain a law that was by definition irrational. So we're not asking the court to do that today. We never have. And it seems to me that the beginning and the end of the discussion about this interesting academic question, which would make the subject of a very interesting law review article about the exact meshing of Jacobson Abbott with rational basis. I don't think the court has to reach it. And I think a very sensible resolution of it is the one I've just said. Namely, Jacobson and Abbott tell this court that rational basis review is at its absolute apex in this context. So, again, I just briefly to review the rational basis standard, as you know, it permits. But just very quickly, it seemed like Judge Feldman did seem to think the case turned on a heightened deference. Judge Samra, he has perhaps suggested that less, but Judge Feldman. But that's a point you've already covered a little bit. Matt, the only other point I'd ask is, do you recall the Sixth Circuit's unpublished decision from last June in fitness facility? Yes, I thought that they did do essentially Jacobson equals rational basis. Again, you're comfortable with that test being applied? Yes, I'm comfortable with that test being applied with the qualification that, again, I think it is a very poignant reminder to this and other courts of the issue of, let's loosely call it diminished judicial competence in this particular area, and therefore a great deal of caution being required in the application of the rational basis standard. It isn't a different standard. It's simply a, I would call it a gloss on the rational basis standard. Again, I think to the extent Judge Feldman may not have said that precisely. Again, these are fast moving cases and fast moving law. I think that's what he had in mind. Now, again, Judge Higginson, you have mentioned many of the points that I would make in terms of the rational basis, multiple rational basis. I would say by my count, there may be as many as 10 rational basis for this classification for allowing restaurant bars to continue to operate under limited capacity and operating as restaurants. And on the other hand, telling bars, freestanding bars, traditional bars that they could not engage in on site premise sales at all. May I take a minute simply to go through those quickly for the court? Yeah, that'll be helpful. I guess if you could, I was thinking more of three, maybe there are 10, but the tracing to outbreaks and the White House warning. But did those two possible justifications draw a distinction between bars standalone and restaurant bars? In other words, when they traced outbreaks, was it traced with this distinction, the distinction in mind? Or is it much more the testimony that was received that described the difference of risk of spread? The tracing did, as it turned out, distinguish between bars and restaurant bars. That is not significant to the governor's decision at the time he made he implemented JB 89, JB 2020. Mr Faircloth has made a great deal over the fact that at the Judge Feldman hearing, Dr B, you said he wasn't sure whether the tracing data differentiated between bars and restaurant bars over the weekend. We did a deep dive, if you will, into the data found out that it did differentiate and that, in fact, it continued to confirm the fact that the overwhelming number of outbreaks were traceable to freestanding bars. But in any event, Your Honor, the the distinction here is really between bars and restaurants because the open safely guidance that the governor incorporated by reference in executive order after executive order after executive order required restaurant bars so called to will as bars. So again, that's why all of the data, all of the rational basis information that I was about to go ahead, go ahead and list the 10 why it's relevant to the restaurant bar distinction. Excuse me. So just quickly, I'm going to go through these. And number one, the primary purpose of individuals going to bars is to socialize, while the primary purpose of individuals going to a restaurant is to eat a meal. And that that appears in the governor's testimony at 9 10 in the 9 10 record at page 12 21. And Dr B used testimony at the in the 9 10 record at page 11 28. Number two, in contrast to bars, patrons of restaurants and bars that serve food tend to sit at table in groups and do not move freely around the restaurant. That's a quotation from Judge Summer Hayes's opinion at page 23. It's supported by Dr B. You at page 104 of his testimony before Judge Summer Hayes. It's also supported by a very important document that the governor said he relied on, which is the California Department of Health proposal for selective closing of bars. That's defendants exhibit 16 in the four aces record at page 13 74 75. Ah, bar. Foundationally, there's a social setting where typically not only small groups convene, but also where groups mixed with other groups. Third, people linger in bars, whereas in restaurants they tend to eat their meal and move on again. That is, uh, described specifically in the California D O H document I mentioned in the the California document speaks of the differential duration of time spent in bars versus restaurants also testified to by Dr B. You number four alcohol consumption reduces inhibition and compliance with mask and social distancing requirements, thereby increasing the danger of covert spread. Ah, record references for that the California document at record 13 74 75. Dr B. Use extensive testimony on this point in the 9 10 record at 11 13 11 14 Governor Edwards testimony in the 9 10 record at page 12 21. I'm I'm not reading these quotations from the testimony in order to save time. I hope that's okay. Number five bars often have music or entertainment that causes people to raise their voices to be heard and to move closer to others to be heard, thus increasing the risk of spread. That's in Judge Summer. Hayes opinion at page 22 also testified to by Dr B. You, uh, page record page 11 13 and by the governor at record page 12 21. And it appears in the California D O H proposal at four aces record 13 74 75. Number six bar patrons generally fall within a younger age group that is more likely to be asymptomatic, thus increasing the likelihood that they could spread the disease both in the bar and when they leave. That's Judge Summer. Hayes is opinion of page 23 supported by testimony from Dr B. You and the governor at respectively the 9 10 record 11 14 and 12 21 and the California document as well. Number seven. Governor Edwards testified at 9 10 record page 12 22. Young people who patronize bars don't just go to one bar. They go bar hopping. They'll go from one to the other, interacting with different groups of people at different bars. Number eight. Governor Edwards testimony at again record 12 21. And this is the contract. Excuse me. The contact tracing testimony. He said we knew from contact tracing data that the biggest percentage of outbreaks were traced to any trace to any particular non congregate venue were traced to bars, and the biggest number of cases were traced to bars. Number nine. White House guidance, which Judge Higginson you referred to a short while ago. White House guidance repeatedly focused on the need to either close bars or control the patronage of bars. That's Judge Summer Hayes opinion of 23 again. Testimony also from Governor Edwards at record 12 19 number 10. This is a point that's actually supported in some of the district court cases, including the tally Wacker case from North Carolina. 2020 Westlaw 305 12 07. This is the point that restaurants serve an important role in the social fabric in it during a time of pandemic, and it is more important to keep restaurants open than it is to keep bars open, which is another rational basis for not allowing on site consumption in freestanding bars, yet allowing restaurant bars to operate as restaurants as an adjunct of the main restaurant. The governor said he didn't shut down restaurants because there's a certain segment of our population that routinely derive a good portion of their nutrition from restaurants. So for those reasons, we didn't close restaurants, but we did put a stop. Excuse me. We did put an order in to stop bars from functioning as bars within restaurants. And then again, excuse me. I said 10 reasons. I'm gonna add two more. Make it 11 and 12 number 11. Just after the governor issued his bar closure order 89 J. B. E. Dr Burks and the White House report for the state of Louisiana, both specifically recommended bar closure. The governor testified about that on page 12 26 of the 9 10 record. Dr Burke said in Louisiana, you're hot for cases. You're hot for positivity. You need to do with the governor of Arizona did, and she met closing bars number 12. And I think this is a an important point. The rationality of the distinction that the governor made has been borne out by the results achieved from the bar closure order. Namely, if you look at exhibits 13 14 and 15, which are the state reports from the White House exhibits 37 38 39 and 42. They all show that after the governor entered 89 J. B. E. There was a dramatic decline in the positivity rate in the number of cases being reported, and particularly it showed a direct downturn among the 18 to 29 year old age group. So again, I think that a the Jacobson Abbott versus rational basis test Ah, conflict is no conflict. Number two. I think that if the rational basis test is applied here, it's the end of the discussion. Now, having said all that, may I return briefly to mootness or are there other questions the court would prefer me to answer? There is no vagueness issue before us. And what's the current status of the state court litigation relating to these orders? The current status of the state court litigation in which the legislators seek to mandamus the governor to issue a proclamation declaring an end to the entire public health emergency and the governor seeks a declaratory judgment that the legislators petition attempting to do so is unconstitutional. Ah, the status of that is that Judge Moravant in the 19th Judicial District Court in Baton Rouge has set a hearing on what I believe to be the various let's loosely call them cross actions, putting at issue the continuing validity of the governor's all of the governor's proclamations. We've set that hearing for the 12th of November, which is what? Only slightly more than a week away. Okay, minute now for mootness. A word about mootness. First of all, as we said in our reply brief in support of mootness, there's absolutely no issue here about the voluntary cessation exception of mootness doesn't apply because there's been no litigation maneuvering. All of the governor's orders expired as of a certain date. Ah, this order 89 J. B. E. expired on September the 11th. Ah, actually, its extensions expired on September the 11th to be precise. At that point, Phase three came into play, which was an order of general applicability. Ah, reshuffling the entire deck of cards, if you will, in terms of Phase two, which had existed previously and 89 J. B. E. Ah, the argument that that Mr Faircloth makes is essentially there remains some sort of difference between bars and restaurants, and therefore is his challenge to a specific differentiation between bars and restaurants is not moot. Well, that's that's just not logical. The current regime creates a very different differentiation between bars and restaurants he has never filed, nor has any district court ever decided what amounts to a kind of an omnibus attack on any difference between bars and restaurants. So the fact remains that there's no effectual relief that this court can grant. Ah, 89 J. B. E. The order upon which this case was was filed and the circumstances that surrounded it on July the 11th 2020 X months ago when it was issued are in effect have faded into history. So the whatever the current distinction may be is founded upon an entirely different set of let's call it Cove it related circumstances and arguable rational bases than those that existed 34 months ago when this controversy began. So I think any possibility of this court rendering a decree of some kind that that has any any effect other than to take on the general proposition that the court is going to adjudicate as yet unpled, unargued cases having to do with general differentiation between one class and the other. I think this case is as moot as it can be, and I'll just add that in terms of any, uh, capable of repetition issue here, as the court said, and spell the Edwards very directly. Pure speculation. Pure speculation that such an order would ever be entered again in the form of 89 J. B. E. And more importantly, entirely speculative that the conditions on the ground that create the controversy surrounding 89 J. B. E. Would ever be the same again. So if if somehow the governor were to re enter that order, uh, it would be an entirely new case or controversy and not the one that's before the court today, which is who? Thank you. Thank you, sir. Mr. Fair. Your honor, it's important. I think you do know this. We're challenging the means. We're not challenging the rationality of the governor restricting bars. That's the object here, and that's what this entire diversions been about. We're challenging the means he chose to do it. That is the crux of the equal protection argument, and the means he chose here was to create a differentiation of two classes, and he used nuance and vaguery to do it, and he got caught. I mean, you just can't escape the fact that the bar closure order says bars are prohibited from serving drinks or food on premises bars. So but unfortunately, all bars are not prohibited from serving drinks or food on on premises. In fact, restaurant bars are still open, and the evidence in the case, despite what Mr White said, is uncontroverted. The A. R. Bars are still open and operating. Our clients testified to that. I attempted to introduce testimony from an expert who did a field survey and discovered that the governor put on no evidence whatsoever as to enforcement or whether bars were open or why he didn't define bars within the order or who controls the enforcement of bars. So this is their argument is built on a legal fiction, and the fiction is that he somehow altered the legal distinction between bars. The legal distinction of Louisiana between bars. He altered it by incorporating a fire marshal's guidance document. That's their case, and that's why the rationality test can't be applied. Or excuse me, the theoretical rationality can apply. He got caught in this instant playing political expediency in this order. He wanted to appear as though he was categorical closing bars because the White House was telling him to close bars, but he wanted to give himself enough slack so he could let some to do it. And that's the case. That is absolutely the case, Your Honor. I cannot emphasize enough how important it is what Mr Weiss just said about. They did a deep dive on Saturday. We had a trial in Judge Feldman's court on Friday, and the evidence was closed at about four o'clock and Judge Feldman drilled down into that distinction in the tracing data that doesn't exist. He said it exists. It does. Judge Feldman question that tracing data talks about bars and draw any distinction between restaurant bars and bar bars, and Judge Feldman drilled into that. Over the weekend, they apparently went into the data, and on Sunday, two days after the close of evidence, within 24 hours of the trial in Judge Somerhase's court, they filed an affidavit or sought to file an affidavit from Dr Biot saying, Wait a minute. We went down and looked at the internal data, and here's additional information. I, of course, objected because I couldn't cross determine moot their their motion for leave to file it. But we go to Judge Somerhase from the next book, and they completely abandoned the issue that they drew a rational distinction. And I'm reading from the governor's testimony, and I put it in my brief. I trust you've seen it where he was explicitly asked. Was there ever a discussion with you about whether or not those particular bars that are listed here on the tracing data were bars that were standalone bars or inside a restaurant? And he said no, and he was asked by his counsel. And why was that particular distinction not important? At least something you didn't believe was important. His answer was well, because in my opinion, a bar is a bar. If a bar is open and functioning as a bar, whether it's inside a restaurant or it's standing alone a business without a restaurant, I think people are going to behave similarly. So I never made the distinction. I'm not sure there is one to be made. That's the governor of Louisiana who appoints the commissioner of the Office of Tobacco Control, saying that he doesn't think there's a distinction between bars and restaurant bars and bars. Louisiana law's permitting classification scheme creates that distinction. He could have altered it for purposes of this emergency, but he would have had to do it in that order, and he didn't. And that's what this case is about. Yes, sir, Judge Higginson? No, I coughed, but I can always come up with a question. I guess I'm accepting a lot of that in terms of the order. The order, you're right, it explicitly incorporates the fire marshal classification. So I guess I keep coming back to the question is, just is there a rational basis to treat, forget the word bar, AR businesses differently from AG businesses. But then the 12 factors, or quite a few of them, would seem to apply. If they had been a part of the governor's decision, or if the governor had not chose to insert his actual motive. And that's important. In the Heller case, the court, Heller versus Doe, the court, the United States Supreme Court said that a state need not articulate its rationale, and quote, has no evidence, no obligation to produce evidence to sustain the rationality. And that's where the theoretical rational speculation rule really emerged. Okay. But he did, even though he had no obligation, he could have rested on Friday's position. On Monday, in front of Judge Summerhays, this governor took the stand and said, I didn't make that decision. To now give him the benefit, when his decision was wrongheaded, to now give him the benefit of theoretical rationality to save his incorrect decision, that's not deference. That's the exact opposite of deference. It's bad enough. Jacobson and Abbott say you can't second guess state actors. This is not second guessing a state actor. In this case, we would be bailing out a state actor. It would be relying on theoretical rationality to save a state actor from a decision that he- Well, arguably, that's what rational basis is all about. I mean, rational basis, you have judges after the fact coming up with, on their own, these hypothetical, theoretical, conceivable justifications for why what government did might maybe have been rationally related to what government said they were up to. I mean, rational basis is sort of a judicial shrug, right? I mean, I know it. You know it. The American people know it. There's nothing more deferential than rational basis. The fundamental difference, Your Honor, is that here, you had a governor who said he didn't rely on those things. He rejected himself the theoretical rationality as a defense, and he placed his actual intentions into issue. He made that the issue. This is a very interesting case, and I'm sorry that I have to call time on it. We could sit and listen to you all day, but we have other cases to get ready for tomorrow, so I have to ask you to bring your statement to a close, if you haven't already. You okay? Okay. Thank you, sir. This case will be submitted, and this court will adjourn until one o'clock tomorrow afternoon. Thank you, gentlemen. Very good arguments.